**Rick D. WILCOX, Plaintiff,**

v.

**Scott E. ELLIOTT, et al., Defendants.**

**No. Civ.A. 2:98–0007.**

United States District Court,
S.D. West Virginia,
Charleston Division.

Feb. 10, 1999.

Thomas F. Basile and Guy R. Bucci, Charleston, West Virginia, for plaintiff.

Jeffrey K. Phillips and Ancil G. Ramey, Steptoe & Johnson, Charleston, WV, for defendants.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are separate summary judgment motions filed by (1) Defendants City of Dunbar, the Police Department of the City of Dunbar,[1] former Mayor Howard Ray Whittington, former Police Chief Ivan Lee; and (2) Defendant Officer Scott E. Elliott. The Court **GRANTS** in part and **DENIES** in part Defendants' motions. The remaining state law claims are **REMANDED** to the Circuit Court of Kanawha County pursuant to 28 U.S.C. § 1367.

### I. FACTUAL BACKGROUND

At approximately 1:00 p.m. on December 13, 1996, Plaintiff Rick D. Wilcox started his 1989 Honda Accord to drive to work.[2]

---

1. The Police Department of the City of Dunbar was not specifically mentioned as a movant in the motion. This appears to be an oversight. Accordingly, the Court treats the Police Department as a movant.

2. Plaintiff's memorandum in opposition states as follows:

Due to the voluminous testimony and document production generated by the discovery in this case and the limits placed on the length of memoranda of law by the local rules, the plaintiff's statement of facts is not intended to present all the evidence on any factual matter.

After traveling only a short distance, he realized he left something at his home. He parked his car in front of neighbor Eugene Mellert's home and walked the short distance to his house.

After Wilcox retrieved the forgotten item, he peered through his living room window and saw Mellert attempting to, as he surmises, break into the Accord. Mellert's behavior angered Wilcox. Consequently, Wilcox went to Mellert's house to discuss the matter.

Wilcox rang Mellert's bell and waited approximately twenty seconds. He states Mellert was within but would not answer the door. Wilcox then left and returned to his own home. He returned to Mellert's a half hour later and rang the bell again. He claims Mellert appeared at the screen door, told Wilcox to leave and called him a son-of-a-bitch. Wilcox did not respond. Rather, he left the premises immediately and went to his car and retrieved a camera.

Despite Mellert's specific instructions to leave the property, Wilcox not only returned to Mellert's porch and rang the doorbell but then (1) proceeded to the curb, (2) waited till Mellert appeared at the door and (3) began acting as if he were photographing Mellert's house. Wilcox testified about his motive:

Q  Why [did you take the pictures]?

A  Because at the time, I felt like being as petty with Mr. Mellert as Mr. Mellert was being petty with me.

Q  But what did the pictures have to do with anything?

A  Nothing.

Q  Why would you decide to do that rather than something else?

A  To make Mr. Mellert angry.

Dep. of Rick D. Wilcox at 42.

Following the picture-taking episode, Wilcox returned to his vehicle, backed up and drove away. Wilcox said a vehicle was behind him, but he believed he would have felt it if he made contact with the car. He admitted, however, he did not know if it was possible to hit a vehicle with such slight force that he would not sense hitting it.[3] Wilcox said he had no idea whether anyone was in the car behind him. In fact, Mellert's elderly stepmother, who had just been released from the hospital after open-heart surgery, was in the vehicle.

Unbeknownst to Wilcox, and apparently prior to the camera incident, Mellert phoned the Police Department of the City of Dunbar to complain about Wilcox coming onto his property and acting strangely. Lieutenant Randy Gillespie and Officer Robert Wise, an officer in training, were dispatched to Mellert's home to investigate. Mellert informed Gillespie that he believed the Accord parked in front of his house belonged to Wilcox. Mellert identified Wilcox generally to Gillespie and told him where he thought Wilcox lived. He did not name Wilcox to Gillespie.

Lieutenant Gillespie explained to Mellert there did not appear to be any criminal activity to that point, because Wilcox left when Mellert instructed him to do so. Lieutenant Gillespie, however, agreed to talk with Wilcox. Unfortunately, Gillespie received no response when he knocked on the door of the house Mellert described. The officers returned and informed Mellert of the visit. Gillespie further told Mellert to inquire of the city judge to see if there were grounds to file a criminal

---

Opp. memo. at 2 n. 1. As Plaintiff's counsel is aware, the Court entertains motions to exceed the page limitation. In fact, such a motion was filed by Plaintiff in this case, and the Court **GRANTS** the motion. Consequently, Plaintiff cannot shift his burden under the *Celotex* trilogy to the Court. The Court treats as disputed only those facts Plaintiff has disputed in his memorandum.

3.  One of Mellert's neighbors, Dewayne Boggess, testified that Wilcox "backed up and bumped into the Mellert's car, just slightly bumped into it." Pl.'s ex. 3, testimony of Dewayne Boggess in Municipal Court trial. The arresting officer, Scott E. Elliott testified at Wilcox' criminal trial it was possible for Wilcox not to know he had struck a vehicle.

complaint for trespassing. Lieutenant Gillespie and Officer Wise then resumed patrol.

Again, during the colloquy between Mellert and the police, and prior to the picture-taking incident, Wilcox apparently was in his home. He was engrossed with making a sign that said "Cats and Boats for Sale," [4] with the intent to place it in the side window of his automobile. He hoped when he next returned to speak with Mellert the latter might notice the sign. Wilcox acknowledges freely the pettiness of his actions.

Apparently just after Wilcox departed in his Accord, Gillespie and Wise were summoned again to the Mellert property as a result of Wilcox' second visit and use of the camera. When Gillespie and Wise returned, Mellert and several of his neighbors were waiting outside Mellert's residence. Mellert told Gillespie Wilcox had returned and was acting in a "peculiar nature, refusing to talk to people." Deposition of Randy Lynn Gillespie at 37. Gillespie noted the group said that Wilcox "was just acting weird" and had "gotten into like a blue-green Honda, had backed into the car that was parked in front of Mellert's house that had the elderly woman sitting in it and had drove off." *Id.* at 37. Gillespie saw a "fresh scratch" and a "new dent" in the bumper area of the Mellert vehicle.

At about this time, officer Scott E. Elliott arrived on the scene. Just then, the group pointed out Wilcox' car pulling down the alley behind Mellert's house exclaiming "There's the car that just struck this one and it's going down the alley." *Id.* at 38. Less than five minutes elapsed between the time of impact between the cars and the sighting of Wilcox' departing vehicle.

According to Gillespie, he approached the vehicle after he saw Wilcox wave. He claims that when he was within 10–15 feet of the car, Wilcox drove away. Wilcox denies ever seeing the officers, much less waving to them. He does not remember stopping his car in the alley either.

As Elliott was getting out of his police car, he was instructed to get back in his car and pursue the Wilcox vehicle. He was told by either Gillespie or Wise "There he is. He's in the alley. Go get him." Dep. of Scott E. Elliott at 35. At that point, Elliott did not know why he was instructed to give chase and stop Wilcox.

Within a short time of giving chase, Elliott located Wilcox and engaged his police lights. Prior to pulling Wilcox over, but after commencing the chase, Elliott had been informed of the possibility that Wilcox had left the scene of an accident, a misdemeanor. When Wilcox observed the flashing blue lights of Elliott's police car directly behind him, he pulled over and stopped.[5] According to Wilcox, the amount of time that passed from when he left the Mellert home until he first saw police lights was just a minute or two.

Officer Elliott approached the Wilcox vehicle and asked Wilcox for his driver's license, proof of insurance and registration. Wilcox complied with the request. While Wilcox was still seated in his vehicle, he asked Officer Elliott on two occasions why he was being stopped and received no response. Wilcox then complied with Officer Elliott's request to step out of his vehicle to the rear of the car.

After exiting the vehicle, Wilcox asked Officer Elliott at least two more times why he was being stopped. Officer Elliott re-

---

4. The sign was intended to taunt Mellert, whom Wilcox believed had reported him to police previously for a roaming cat and an illegally parked boat.

5. Wilcox had previous encounters with city government officials and police officers. He admitted he "had words" with officers on a couple of occasions resulting from vandalism

at his house. Wilcox depo. at 97. Wilcox also was found guilty of battery by a city judge after he was accused of punching a youth for allegedly damaging a basketball hoop at his house. He also now appears to be awaiting resolution of a charge of domestic battery.

sponded with a question to Wilcox as to whether he knew what was going on over on West Virginia Avenue and whether Wilcox had hit a car at that location. Wilcox said no. Wilcox then asked Officer Elliott whether it would be possible to go over to the location of the alleged accident, have a look at the car he was being accused of striking and further investigate what it is he was being accused of doing. Elliott acknowledges as much, but claims the volatility of the situation counseled against granting Wilcox' request.

While Elliott was questioning Wilcox, a crowd started to gather from a bar across the street which made Elliott uncomfortable. Elliott testified he was concerned about the people coming from the bar because of previous DUI encounters with several patrons.

Somewhere about this time during Elliott's stop of Wilcox, he communicated with Gillespie to seek further direction about how to proceed. Gillespie informed Elliott that he had four signed statements from witnesses with respect to Wilcox leaving the scene of an accident and instructed Elliott to arrest Wilcox on that charge. Based on this directive from his supervising officer, Elliott proceeded to conduct a pat-down on Wilcox, handcuffed him and put him in his patrol car. Wilcox has testified that at this point, he still did not know what he was being charged with or why he was being placed under arrest and that each time he asked for answers to these questions, Officer Elliott responded that he was in control. While Wilcox was seated in Elliott's police car, Elliott proceeded to conduct an inventory of the items in the Wilcox vehicle.

Pursuant to a request from Wilcox, Officer Elliott took photos of the rear bumper of Wilcox' Honda Accord, the alleged location of impact with the Mellert vehicle. Officer Elliott conceded there was no damage to Wilcox' vehicle. Importantly, Officer Elliott also conceded he did not arrest Wilcox in the first instance for leaving the scene of an accident based on his own observations, but rather on the information solely conveyed to him by Lieutenant Gillespie.

Just after Officer Elliott handcuffed Wilcox, he heard on his police radio that a signed complaint had been submitted to the City Judge and that Wilcox was also wanted for trespassing.[6] Officer Elliott asserts he informed Wilcox he was under arrest for both leaving the scene of an accident and trespassing. The Court accepts, however, Wilcox' assertion he was neither informed of what he was being charged with nor why he was being detained and was not made certain he was under arrest for specific charges until he was arraigned before Judge Bruner later that night.

While Officer Elliott was inventorying the Wilcox vehicle, Lieutenant Gillespie and Officer Wise arrived on the scene. Elliott testified that Officer Wise entered his patrol car to speak with Wilcox and, upon returning, informed Elliott there was a smell of alcohol around Wilcox. Elliott then asked Wilcox whether he had been drinking, to which Elliott states Wilcox replied "yes, a couple with lunch." Wilcox adamantly denies that version. Rather, Wilcox testified he told Elliott he had a beer at lunch, which was approximately 3–4 hours before Elliott had stopped him. According to Elliott, he then placed Wilcox under arrest for DUI.

Officer Elliott testified he noticed the smell of alcohol on first approaching Wilcox' car, but he was not sure if the alcohol smell was from Wilcox or from the nearby bar. Officer Elliott did not administer a field sobriety test to Wilcox and Wilcox was not informed of his *Miranda* Rights. Elliott has testified that pursuant to his police training, he understood there was

**6.** Municipal Judge Richard L. Bruner found "overwhelming probable cause" to issue a warrant for Wilcox for trespassing on Mellert's property. Ex. E, Def.'s motion for summ. jgt.

nothing improper about him asking Wilcox questions about a potential DUI offense even though he was already in custody for another criminal offense (leaving the scene of an accident), as long as his questions dealt solely with the DUI and did not attempt to gain information from Wilcox about the crime for which he was already under arrest.

Wilcox was then taken to the Dunbar Police Department where Officer Elliott attempted to administer a chemical breath test. Wilcox initially refused the test until he was given the opportunity to speak to a lawyer, but after thirty minutes of trying unsuccessfully to reach his lawyer, he agreed under protest to be tested.[7]

There were two breath tests run on Wilcox. The first came between 5:39 p.m. and 5:44 p.m. and registered as no sample being given. The second was run between 6:10 p.m. and 6:12 p.m. and the result was an invalid sample. Wilcox was locked in a cell for about one hour following the test until he was taken before Judge Bruner. While locked in the cell, Wilcox heard the police officers laughing about him, Officer Elliott commenting "Wonder how he's enjoying that?" Wilcox dep. at 145.

According to Wilcox, Judge Bruner informed him for the first time of the four criminal charges lodged against him. Wilcox was arraigned on (1) trespassing, (2) leaving the scene of an accident, (3) DUI (first offense), and (4) obstructing an officer. Wilcox was not informed when he was in Judge Bruner's presence of whether a bond would be set for him and what it would take for him to make bond and avoid being sent to jail on the evening of December 13, 1996. There is no apparent dispute that the four criminal charges brought against Wilcox on December 13, 1996 were misdemeanors and that the arrest of Wilcox by Officer Elliott was effected without a warrant.

Eventually, Wilcox was able to reach his lawyer, Stephen L. Thompson. Thompson spoke with Officer Elliott about Wilcox' detention and learned that Wilcox had taken two breath tests but that neither had registered. Thompson further testified that Officer Elliott reported to him during that telephone conversation that Wilcox had not done anything incorrectly in taking the test and that he had blown into the machine according to Elliott's directions.[8] Thompson also testified that Elliott informed him he would charge Wilcox with obstructing an officer for his belligerent or loud and demanding behavior while he was in custody. Thompson specifically testified as follows concerning his exchange with Elliott:

A He said there would be no bond, he was going to South Central Regional Jail.

Q What was said next?

---

7. Interestingly, it is the police report that shows the test was taken under protest. At one point in his testimony, Wilcox suggests he talked to his lawyer prior to being administered the Breathalyser.

8. Attorney Thompson testified he specifically asked Officer Elliott if he would inform the Department of Motor Vehicles (DMV) that Wilcox had refused to take a breath test or whether he would inform the DMV that the machine did not accurately reflect the results of the tests that Wilcox had taken. Thompson stated Elliott informed him he would tell the DMV Wilcox took the tests but that the Breathalyser machine did not calibrate the results properly. The following day, however, Officer Elliott informed the DMV Wilcox refused to submit to a breath test. Wilcox' driver's license was ordered revoked as a result.

Wilcox challenged the revocation at a DMV hearing. During the hearing, Officer Elliott testified Wilcox had indeed taken a breath test. At the conclusion of the DMV hearing, Commissioner Joe E. Miller found, inter alia, (1) that Officer Elliott had failed to present evidence sufficient to uphold the Order of Revocation regarding Wilcox' driver's license; (2) that Officer Elliott had failed to produce evidence of a lawful arrest on a DUI charge; and (3) that the State had failed to present sufficient evidence to prove that Wilcox had driven a motor vehicle while under the influence of alcohol.

A He said that Mr. Wilcox kept demanding his rights throughout this entire episode and he was going to charge him with obstruction.

Dep. of Stephen L. Thompson at 27.

According to Thompson, Elliott also informed him that Wilcox was not cooperating with Judge Bruner, that there would be no bond set for him and that he was going to South Central Regional Jail for the night.[9]

After Wilcox was taken to the South Central Regional Jail by Officer Elliott, he learned for the first time from family members that he would need a $1,000.00 cash bond in order to avoid being jailed for the evening and that a personal check would not be acceptable. Because it was late on a Friday evening, Wilcox had no alternative but to spend the evening in jail and was not released until his family was able to produce the bail money the next day around noon.

On April 23, 1997 the City of Dunbar prosecuted Wilcox in a criminal trial. Wilcox was convicted only on the trespassing charge. Following the trial, Wilcox testified he has been harassed by over 300 threatening phone calls that appear to be related to his troubles with the Dunbar Police Department.

On December 11, 1997 Wilcox filed a nine-count complaint in the Circuit Court of Kanawha County alleging (1) federal constitutional claims, detailed more fully below, against Officer Elliott personally; (2) claims for failure to train and supervise against all Defendants, except Officer Elliott; (3) constitutional claims pursuant to the West Virginia Constitution; (4) malicious prosecution; (5) intentional infliction of emotional distress; (6) prima facie tort; (7) false imprisonment; (8) defamation; and (9) false arrest.

Wilcox states the federal constitutional rights sought to be enforced "include[ ]" the "Fourth Amendment right to be secure in his person and home and free from unlawful seizure of his person, Fifth and Fourteenth Amendment rights to due process of law, and Eight[h] Amendment right to be free from cruel and unusual punishment." Compl. ¶ 8.

Despite the complaint's assignment of rights allegedly violated, both parties appear to have narrowed their focus as to what constitutional deprivations are involved. While it calls for some guesswork on the Court's part, it appears Wilcox seeks redress principally for an unconstitutional seizure of his person in violation of the Fourth Amendment, as made applicable to the states under the Fourteenth Amendment.[10] His basis for saying the

9. Judge Bruner stated in his affidavit that Wilcox "was extremely uncooperative when he was arraigned before me" and that "it appeared as if ... Wilcox was intoxicated when he" appeared before the Judge. Ex. E, Defs.' motion for summ. jgt.

10. Wilcox complains as well about his confinement and prosecution, but these claims appear largely dependent upon his allegedly unconstitutional arrest. He also appears to have abandoned any serious claim arising from the Eighth Amendment or Elliott's failure to advise him of his *Miranda* rights. Several references from Wilcox' brief lead the Court to the conclusion that Wilcox has strategically limited his claims. First, Wilcox states as follows:

Elliott carried out the arrest of Wilcox for leaving the scene of an accident when he had serious doubts about the actual commission of that misdemeanor offense by Wilcox. *An arrest on these grounds* amounts to a deprivation of Wilcox' civil rights under the Fourth and Fourteenth Amendments due to an unlawful arrest *and* confinement.

Memo in opp. at 19. Later he states as follows:

In this controversy, Wilcox' Fourth, Fifth and Fourteenth Amendment rights to be free of an improper arrest and seizure have been [a]ffected, as well as his right to be free from wrongful prosecution. These rights were clearly established at the time that Wilcox was arrested, *inasmuch as it has long been established that a warrantless arrest for a misdemeanor offense cannot take place unless that misdemeanor offense has been committed in the presence of the arresting officer.*

*Id.* at 23.

Further, while Wilcox complains all three bases for his arrest ((1) leaving the scene of

seizure was unconstitutional is the well-established principle of West Virginia law known as the "presence rule." That rule provides "a warrantless arrest for a misdemeanor offense cannot take place unless that misdemeanor offense has been committed in the presence of the arresting officer." Memo in opp. at 23.

## II. DISCUSSION

### A. The Summary Judgment Standard

Our Court of Appeals has often stated the settled standard and shifting burdens governing the disposition of a motion for summary judgment:

Rule 56(c) requires that the district court enter judgment against a party who, "after adequate time for ... discovery fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," To prevail on a motion for summary judgment, the [movant] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact has been raised, we must construe all inferences in favor of the [the nonmovant]. If, however, "the evidence is so one-sided that one party must prevail as a matter of law," we must affirm the grant of summary judgment in that party's favor. The [nonmovant] "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another," To survive [the motion], the [nonmovant] may not rest on (his) pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. As the *Anderson* Court explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on

which the jury could reasonably find for the plaintiff[.]"

*Harleysville Mut. Ins. Co. v. Packer*, 60 F.3d 1116, 1119–20 (4th Cir.1995) (citations omitted); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), *cert. denied*, 513 U.S. 813, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *see also Cabro Foods, Inc. v. Wells Fargo Armored Service Corp.*, 962 F.Supp. 75, 77 (S.D.W.Va.1997); *Spradling v. Blackburn*, 919 F.Supp. 969, 974 (S.D.W.Va.1996).

"At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." *Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1323 (4th Cir.1995).

### B. The Federal Constitutional Claims

■ The parties assume that an arrest contravening West Virginia law, namely the presence rule, necessarily amounts to a federal constitutional claim. The actual question in controversy, however, is whether Wilcox enjoys a federal constitutional right to be arrested only in accordance with the presence rule. The Fourth Circuit has answered that question in the negative.

In *Street v. Surdyka*, 492 F.2d 368 (4th Cir.1974), our Court of Appeals faced squarely the question of whether the presence rule plays any role in the section 1983 calculus. In sum, the Court concluded "we decline to tie section 1983 to the technicalities of state law." *Id.* at 370. The basis for *Street*'s conclusion is worth quoting at length:

Maryland, like many other states, follows the common law rules on warrantless arrest. An officer needs no warrant to make an arrest if he has probable

an accident, (2) trespass and (3) DUI) were in violation of the federal constitution, all would apparently concede that if at least one basis

for Wilcox' arrest was in actuality supported by probable cause, he could not then argue he was seized unconstitutionally.

cause to believe a felony has been committed, but probable cause is not enough to authorize warrantless arrest for a misdemeanor. *The misdemeanor must also have been committed in the officer's presence.* If Officer Surdyka violated this Maryland law, he may be liable to plaintiff in an action under the common law of false arrest or false imprisonment. *But section 1983 does not provide a remedy for common law torts. Instead it creates a federal cause of action against those acting under color of state law who cause a 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws (of the United States).'* In many cases the same conduct will violate both state law and the federal Constitution, but certainly not all violations of state law rise to the level of constitutional tort. In *Ralph v. Pepersack,* 335 F.2d 128 (4th Cir.1964), *cert. denied,* 380 U.S. 925, 85 S.Ct. 907, 13 L.Ed.2d 811 (1965), this court considered the relationship of arrest law to the Constitution. A state prisoner argued that his confession should be inadmissible because it resulted from a possibly illegal arrest for 'investigation' in the District of Columbia. Affirming a denial of habeas corpus, the court said:

> There is significant distinction between police action which is unlawful because violative of constitutional provisions and police action which merely fails to accord with statute, rule or some other nonconstitutional mandate. The protection against arrest without probable cause, as well as that against unreasonable searches and seizures, stems directly from the Fourth Amendment. There is no such constitutional prohibition against arrests for investigation where probable cause exists. Certainly not every official

impropriety gives rise to a finding that due process has been denied.

*Id.* at 136. In *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), the Supreme Court construed the reach of the 'under color of law' formula that appears in section 1983 and the criminal statute now codified as § 18 U.S.C. § 242. Justice Douglas wrote:

> But there is no warrant for treating the question in state law terms. The problem is not whether state law has been violated but whether an inhabitant of a State has been deprived of a federal right by one who acts under 'color of any law.'

*Id.* at 108, 65 S.Ct. at 1038. We believe this statement is equally applicable to plaintiff's attempt to use Maryland law in this case. Even if Officer Surdyka violated Maryland arrest law, he cannot be liable under section 1983 unless he also violated the federal constitutional law governing warrantless arrests.

.... *We do not think the fourth amendment should now be interpreted to prohibit warrantless arrests for misdemeanors committed outside an officer's presence* .... The fourth amendment protects individuals from unfounded arrests by requiring reasonable grounds to believe a crime has been committed. The states are free to impose greater restrictions on arrests, but their citizens do not thereby acquire a greater federal right. *Accordingly, there is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause.*

*Id.* at 368–72 (emphasis added) (citations omitted).[11]

Based upon *Street* then, Wilcox had no federal constitutional protection to be arrested in compliance with the presence rule. Rather, he enjoyed only the federal

---

**11.** *Street* is over two decades old. It still has the force of law, however, having never been overruled by the en banc court, limited by other panel decisions or displaced by intervening Supreme Court precedent or statute. In fact, the Court of Appeals relied heavily on *Street* in its much more recent unpublished opinion in *Melton v. Dermota,* No. 90–1530, 1991 WL 147490 (4th Cir. Aug. 6, 1991).

constitutional right not to be arrested without probable cause. Accordingly, the presence of probable cause is the next question to address.

In *Porterfield v. Lott,* 156 F.3d 563 (4th Cir.1998), the Fourth Circuit discussed the sometimes evanescent standard for probable cause:

> Probable cause to justify an arrest arises when "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *see also Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Taylor v. Waters,* 81 F.3d 429, 434 (4th Cir.1996); *Wilkes v. Young,* 28 F.3d 1362, 1365 (4th Cir.1994).... "It is an objective standard of probability that reasonable and prudent persons apply in everyday life." *Id.* And when it is considered in the light of all of the surrounding circumstances, even "seemingly innocent activity" may provide a basis for finding probable cause. *Taylor,* 81 F.3d at 434.

*Porterfield,* 156 F.3d at 569.

■ Utilizing this standard, Officer Elliott clearly possessed probable cause as a matter of law to arrest Wilcox for leaving the scene of an accident. It is well-established in this circuit that an arresting officer need not have personal knowledge of the facts constituting probable cause for arrest. *United States v. Pitt,* 382 F.2d 322 (4th Cir.1967). Rather, "[p]robable cause ... can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest." *Id.* at 324; *see also* 1 John W. Hall, Jr., *Search and Seizure* § 3:17 (2d ed.1991); 2 Wayne R. LaFave, *Search and Seizure—A Treatise on the Fourth Amendment*

§ 3.5(b) (3rd ed.1996). Looking at that collective knowledge here, the following circumstances support a finding of probable cause:

1. Lieutenant Gillespie knew what Wilcox' car looked like and was aware of a rising controversy with the neighbors;

2. Wilcox was acting peculiarly according to witnesses;

3. Officer Elliott was told by Lieutenant Gillespie that four signed statements from witnesses were in police possession attesting to the fact that Wilcox was seen leaving the scene of an accident;

4. Lieutenant Gillespie saw a fresh scratch and a new dent in the bumper area of the Mellert vehicle;

5. Wilcox' car was seen by police and other witnesses departing from the area shortly after the other car was struck;

6. Officer Elliott was instructed by two fellow officers to go get Wilcox;

7. Officer Elliott was informed prior to pulling Wilcox over that Wilcox appeared to have left the scene of an accident; and

These circumstances, along with others appearing in the record, were more than sufficient as a matter of law to warrant Officer Elliott, in the exercise of reasonable caution, to conclude Wilcox had left the scene of an accident. They also demonstrate a meaningful factual investigation was undertaken. Accordingly, Officer Elliott possessed probable cause to arrest Wilcox, and Wilcox has no basis for his section 1983 claim. Further, since Wilcox suffered no federal constitutional deprivation due to his arrest by Officer Elliott, there is no basis for liability against the remaining Defendants on the federal claims. Defendants' motions for summary judgment are **GRANTED** as to the federal claims.[12]

12. The Court observes that even without the

benefit of Street's teachings, the record would

**692**

## C. Disposition of State Law Claims

Title 28 United States Code section 1367(c) provides as follows:

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(3) the district court has dismissed all claims over which it has original jurisdiction ...

*Id.*

■ In *Shanaghan v. Cahill,* 58 F.3d 106 (4th Cir.1995), our Court of Appeals stated "the doctrine of supplemental jurisdiction [contained in § 1367] indicates that federal courts generally have discretion to retain or dismiss state law claims when the federal basis for an action drops away." *Id.* at 109. *Shanaghan* further observed "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Id.* at 110. This discretion, however, is guided by several factors, including (1) convenience and fairness to both parties; (2) underlying issues of federal policy or comity; (3) interests of judicial economy; (4) the existence of any state limitations bar; and (5) the time and energy already expended. *Id.* at 112; *see also City of Chicago v. International College of Surgeons,* 522 U.S. 156, 118 S.Ct. 523, 534, 139 L.Ed.2d 525 (1997).

■ As for the first factor, remand of the remaining state claims is neither unfair nor inconvenient to either party. *See Thaxton v. International Bhd. Of Painters,* 933 F.Supp. 560, 565 (S.D.W.Va.1996). Indeed, Wilcox has requested remand to the forum he initially selected. Defendants' discovery and preparation will serve them just as well in the Circuit Court as it would in this Court. The second factor weighs in favor of remand as well, because it will "allow[ ] a state court to hear a case based on state law." *Id.* The remaining

compel granting summary judgment to Defendants on other bases, including qualified immunity and the lack of any genuine issues of

factors are either neutral or weigh in favor of remand.

Accordingly, the Court **DECLINES** to exercise supplemental jurisdiction over the remaining state claims and **DENIES** without prejudice Defendants' motions for summary judgment on those claims. The remainder of the case is thus **REMANDED** to the Circuit Court of Kanawha County. The remand is fully effective this date for all purposes. The Circuit Court may proceed at its discretion.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel and a certified copy to the Clerk of the Circuit Court of Kanawha County with the case file.

material fact on claims of supervisory liability, municipal custom and policy and failure to train.