**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SHERMAN O. PORTERFIELD,
Plaintiff-Appellee,

v.

LEON LOTT; FAYE ANTHONY; BERRY
BROWN,
Defendants-Appellants,

No. 97-2254

and

RICHLAND COUNTY, a political
subdivision; RICHLAND COUNTY
SHERIFF'S DEPARTMENT; JOHN DOE;
RICHARD ROE; STATE  OF SOUTH
CAROLINA,
Defendants.

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Matthew N. Perry, Jr., Senior District Judge.
(CA-95-2155-3-10)

Argued: April 7, 1998

Decided: September 22, 1998

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Niemeyer wrote
the opinion, in which Judge Murnaghan and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Andrew Frederick Lindemann, ELLIS, LAWHORNE, DAVIDSON & SIMS, P.A., Columbia, South Carolina, for Appellants. Thomas Keith Fowler, Jr., Columbia, South Carolina, for Appellees. **ON BRIEF:** William H. Davidson, II, James M. Davis, Jr., ELLIS, LAWHORNE, DAVIDSON & SIMS, P.A., Columbia, South Carolina, for Appellants.

_____

**OPINION**

NIEMEYER, Circuit Judge:

After money laundering and drug trafficking charges were unsuccessfully prosecuted by Richland County, South Carolina officials against Sherman Porterfield, Porterfield sued three sheriff's deputies under 42 U.S.C. § 1983 for arresting him and pressing the charges against him without probable cause. The district court denied the deputies' claims of qualified immunity, giving no reasons for its ruling. For the reasons that follow, we reverse.

I

In 1990, the Internal Revenue Service became concerned that drug dealers in Richland County, South Carolina, were buying automobiles with drugs and cash, thereby laundering drug money and avoiding federal income reporting requirements. In a joint investigation with the Richland County Sheriff's Department, the officials began investigating automobile dealerships through the use of informants known to the Sheriff's Department. A number of tips indicated that drug dealers were buying automobiles from a dealership known as "Wright's on Main," which was owned by Larry Wright and was located at 2521 Main Street in Columbia, South Carolina.

Shane Thompson, an informant used previously by the Sheriff's Department, was arrested in early 1991 for unrelated cocaine trafficking and, after his arrest, informed a Richland County deputy sheriff that he had negotiated the purchase of an automobile at Wright's on

2

Main for cash and drugs. He indicated that he had agreed with Sherman Porterfield, a salesman at the dealership, to purchase a 1986 Mercedes Benz 190E automobile in exchange for $10,000 in cash and four ounces of powder cocaine which had a value of approximately $4,000 - $5,600. At the Sheriff's Department's request, Thompson agreed to pursue the transaction while being "wired."

The Mercedes Benz under negotiation had been consigned to Wright's on Main under an agreement by which the dealership promised to pay the consignor $12,300 if the car was sold. And if the dealership was unable to sell the car, the consignor would pay the dealership $300 for its "marketing services." The dealership listed the car at retail for $16,995.

To consummate the purchase of the Mercedes Benz, Thompson called Porterfield at Wright's on Main on February 14, 1991, recording the conversation. During this conversation, Thompson told Porterfield that he had been "paid by the insurance company," which was apparently code for his possession of drug money, and that he wanted to consummate the deal the following day. The following exchange about the cocaine, referred to as "blow," then took place:

> THOMPSON: I got all my duckies together. But yo, this the move. I really don't, you know, I really don't want to talk over the phone to[o] much.
>
> PORTERFIELD: That's good.
>
> THOMPSON: But know, I want to come to with all the cash tomorrow, Sherman. Tomorrow after I get out of school. See what I'm saying. I'm going to bring it in a brown paper bag. But I'm not bringing no money in. I going to leave everything in the trunk of the car til you tell me to bring it in.
>
> PORTERFIELD: Got you covered.

3

THOMPSON: Okay. Now thing I need to find out from you. Is that I'm going to bring ten in cash and I'm bring four thousand in blow. Do you want me to leave it in the car or do you want to bring it to you at the job? Or what you want me to do? Tell me now.

PORTERFIELD: Cold, leave the blow out.

THOMPSON: Okay, Okay. Alright.

PORTERFIELD: Don't even do that.

THOMPSON: Don't even do that. Okay, you just want me to bring you ten to you in cash.

PORTERFIELD: Right.

On the next day, February 15, Thompson and an undercover narcotics agent went to the dealership to consummate the transaction with Porterfield. They drove one of the dealership's rental cars that Porterfield had arranged for Thompson to drive. Thompson was again "wired" with a recording device and carried $10,000 in cash. The four ounces of powder cocaine were placed in the trunk of the car. During his meeting with Porterfield, Thompson told Porterfield he wanted to have the title to the car put in a family member's name so that it would not be subject to criminal forfeiture, as had happened to another drug dealer known as "JuJu." As Thompson explained to Porterfield, "If I go down or if I get popped or I take a lick. That way they can't touch my shit, cause it ain't in my name. You understand. It's in somebody in my family, you understand, in their name." Porterfield agreed, "I can do it like that." Porterfield then had Thompson count the cash in front of him, and after Thompson counted out $10,000, Porterfield stated, "You and I right." Thompson confirmed, "You're on," and Porterfield added, "This is business." Before proceeding further with the transaction, however, Porterfield instructed Thompson to remove his jacket to "let me see if you are straight." Porterfield explained, "Nothing personal. We business partners now."

4

When Thompson removed his jacket, Porterfield noticed the recording device which was taped to Thompson's shoulder and angrily terminated the meeting, telling Thompson to leave. Although Thompson later attempted to rehabilitate the transaction, Porterfield refused to deal with him any further.

The sheriff's deputies, including the three defendants, held a meeting and concluded that even though the transaction had not been consummated, they had probable cause to arrest Porterfield for money laundering and cocaine trafficking. Nevertheless, they elected to present their information to a magistrate who issued a warrant for Porterfield's arrest. Porterfield was arrested at the dealership on February 22, 1991, and released on bond.

Several months later, a grand jury indicted Porterfield on one count of drug trafficking and two counts of money laundering. Following a trial, a state jury convicted Porterfield of one count of money laundering in connection with the $10,000 transaction for the Mercedes Benz and acquitted him on the other two counts. The trial judge sentenced Porterfield to 20 years imprisonment, suspended to 5 years service with 5 years probation. Porterfield appealed his conviction, and, in a case of first impression, the South Carolina Court of Appeals reversed the conviction, concluding that the state money laundering statute required the transaction to include the actual proceeds of illegal drugs. Since the $10,000 in this case came from the Sheriff's Department's bank account, the statute had not been satisfied. See State v. Porterfield, 454 S.E.2d 351, 352-53 (S.C. Ct. App. 1995).

Thereafter, Porterfield filed this action under 42 U.S.C. § 1983 contending that he was arrested and imprisoned without probable cause. He asserted claims for (1) false arrest in violation of the Fourth Amendment; (2) malicious prosecution in violation of the Fourth Amendment; (3) illegal search and seizure in violation of the Fourth Amendment; (4) infringement of his right of privacy in violation of the Fourth Amendment; (5) conspiracy to violate his constitutional rights in violation of 42 U.S.C. § 1985; and (6) several pendent state law claims. Pursuant to a consent order and a motion for summary judgment, the district court dismissed all of Porterfield's claims except three claims asserted against the three Richland County sheriff's deputies in their individual capacities for false arrest, malicious

5

prosecution, and illegal search. The court also rejected the defendants' claims for qualified immunity.

The sheriff's deputies noticed this interlocutory appeal from the district court's order denying them qualified immunity. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).

II

To avoid "excessive disruption of government," a qualified immunity is recognized to protect government officials performing discretionary functions from civil damage suits "insofar as [the officials'] conduct does not violate clearly established rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Officials lose the protection of the immunity if they violate a constitutional or statutory right of the plaintiff and the right was clearly established at the time of the alleged violation such that an objectively reasonable official in the defendants' position would have known of it. See id. We summarized these requirements in Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992):

> Ruling on a defense of qualified immunity therefore requires (1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the officer's position would have known that doing what he did would violate the right.

It is thus clear that the degree of knowledge of the law imputed to government officials is that imputable generally to a reasonable official. Accordingly, "all but the plainly incompetent or those who knowingly violate the law" are protected. Malley v. Briggs, 475 U.S. 335, 341 (1986). And we have added, "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciarello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). It also follows that if no right is transgressed, our inquiry ends, because government officials cannot have known of a right that does not exist. See Jackson v. Long, 102 F.3d 722, 728 (4th Cir. 1996).

6

The significant deference given to the judgment of government officials acting in good faith is particularly appropriate in cases involving law enforcement officials investigating serious crimes. The police must have the ability to move swiftly to solve crimes or to apprehend dangerous criminals before evidence is destroyed or becomes stale, witnesses die or vanish, or a suspect has a chance to escape or to repeat the crime. "The ability of police officers to protect the public can be severely hampered . . . if their every decision is subject to second-guessing in a lawsuit." Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir. 1991). Qualified immunity thus provides a "safe-harbor" from tort damages for police officers performing objectively reasonable actions in furtherance of their duties. This is necessary because even the fear of personal financial liability might inhibit them from the conscientious discharge of their duties. Id. at 260-61.

With these principles in hand, we turn to address the question of whether the three sheriff's deputies in this case violated clearly established rights of Porterfield of which they should have known at the time. In other words, we must determine whether the sheriff's deputies were plainly incompetent or knowingly violated the Fourth Amendment in seeking a warrant to arrest Porterfield, in arresting him, and in conducting a search in connection with the arrest.

III

The sheriff's deputies contend that they could not have committed a tort of false arrest in violation of the Fourth Amendment because they were acting pursuant to a facially valid arrest warrant. We agree.

In Brooks v. City of Winston-Salem, 85 F.3d 178 (4th Cir. 1996), we held that a public official cannot be charged with false arrest when he arrests a defendant pursuant to a facially valid warrant. At most, such an official can be pursued through a cause of action for malicious prosecution. In Brooks, as in the case before us, the plaintiff sued police officers on the grounds that his arrest was not supported by probable cause and that his prosecution was pursued by officials who knew of his innocence. Relying on Heck v. Humphrey, 512 U.S. 477, 483-84 (1994), we looked to the most analogous state-law torts as a starting point for analyzing the claim:

7

> At common law, allegations that a warrantless arrest or imprisonment was not supported by probable cause advanced a claim of false arrest or imprisonment. . . . However, allegations that an arrest made pursuant to a warrant was not supported by probable cause, or claims seeking damages for a period after legal process issued, are analogous to the common-law tort of malicious prosecution.

Id. at 181-82 (citations omitted). Thus, we recognized implicitly that a claim for false arrest may be considered only when no arrest warrant has been obtained.

Since the parties in this case do not dispute the fact that the sheriff's deputies obtained a facially valid arrest warrant from a magistrate prior to Porterfield's arrest, no "false arrest" of Porterfield could have occurred. To the extent, therefore, that Porterfield avers that the sheriff's deputies acted unlawfully in arresting him, the allegations must be relevant only to his claim for malicious prosecution. And since Porterfield's right to be free from false arrest was not violated, he cannot allege that the sheriff's deputies violated a clearly established right of which a reasonable person would have known.

IV

The sheriff's deputies also contend that the district court erred in rejecting their claim of qualified immunity from Porterfield's allegations that they maliciously prosecuted him without probable cause, on fabricated evidence, and in violation of the Fourth Amendment. They argue that their actions were objectively reasonable because there was probable cause, as a matter of law, to arrest Porterfield and because they acted in good faith in seeking the warrant used to arrest him. The sheriff's deputies also argue that the objective reasonableness of their actions was confirmed by the similar but independent decisions of (1) the magistrate, who found probable cause and therefore decided to issue the arrest warrant; (2) the prosecutor, who elected to prosecute Porterfield; (3) the grand jury, which found probable cause that Porterfield had committed a crime and therefore indicted him; (4) the jury, which found beyond a reasonable doubt that Porterfield violated the South Carolina money laundering statute; and (5) the state trial judge, who, based on the evidence presented at trial, denied Porter-

8

field's motion for judgment of acquittal. These contentions raise questions of whether the deputies had probable cause to arrest Porterfield and, if so, whether they accurately communicated that probable cause to the magistrate.

Probable cause to justify an arrest arises when "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979); see also Brinegar v. United States , 338 U.S. 160, 175-76 (1949); Taylor v. Waters, 81 F.3d 429, 434 (4th Cir. 1996); Wilkes v. Young, 28 F.3d 1362, 1365 (4th Cir. 1994). Probable cause requires more than "bare suspicion" but requires less than evidence necessary to convict. United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998). "It is an objective standard of probability that reasonable and prudent persons apply in everyday life." Id. And when it is considered in the light of all of the surrounding circumstances, even "seemingly innocent activity" may provide a basis for finding probable cause. Taylor, 81 F.3d at 434.

Considering all of the surrounding circumstances in this case, we conclude that the sheriff's deputies were amply justified in believing that Porterfield was engaging in criminal activity by attempting to sell a Mercedes Benz for cash and drugs. First, there was evidence that known drug dealers were buying cars at the dealership at which Porterfield worked, paying cash and drugs for the vehicles. Second, Thompson told the sheriff's deputies that he had negotiated an agreement with Porterfield to buy a Mercedes Benz for $10,000 in cash plus four ounces of powder cocaine. In furtherance of that alleged agreement, Thompson returned to the dealership under police supervision and proceeded to finalize the transaction, which was not denied or rejected by Porterfield until he searched Thompson and found a "wire." Third, the sheriff's deputies overheard Thompson's conversation with Porterfield about whether to bring the cocaine to the dealership. While the conversation per se was unclear whether Porterfield was telling Thompson to leave the cocaine in the trunk and out of the dealership or to leave it out of the transaction altogether, Porterfield agreed with Thompson that it was not good to talk over the telephone too much. Moreover, Porterfield did not seem surprised that drugs

9

were being discussed as part of the transaction. Thus, even in light of Porterfield's repeated assertions that his statement in the telephone conversation, "cold, leave the blow out," was ambiguous, the sheriff's deputies could reasonably have concluded that Porterfield simply meant that Thompson should "leave the blow out[side in the car]." Fourth, Porterfield's actions during the attempted completion of the deal were highly suspicious. He agreed to place title in someone other than Thompson so that the Mercedes Benz could not be taken from Thompson in a forfeiture proceeding, as had actually happened to "JuJu," a drug dealer who had previously bought a car from the dealership. He also checked Thompson for a wire before completing the transaction in order to determine if Thompson was "straight." In sum, given the clientele to whom the dealership appeared to have been catering, the lack of any reaction to or rejection by Porterfield of the references to illegal activity, and Porterfield's search of Thompson for a wire before he would go any further with the deal, the deputies could have reasonably believed that Porterfield was participating in a deal to sell a car for cash and drugs as asserted to them by Thompson.

The deputies also could have reasonably believed that Porterfield believed he was accepting $10,000 in drug proceeds. The deputies' belief was supported by evidence that Porterfield was told that the $10,000 payment was from the "insurance company" and that the deputies understood this to be code for drug proceeds, that Thompson told Porterfield he was bringing those proceeds to the dealership in the form of cash, that Thompson was bringing the proceeds in a brown paper bag, that Porterfield agreed to place title to the car in someone other than Thompson to help Thompson avoid forfeiture (as happened to a drug dealer named "JuJu," who was another customer of the dealership), and that after Thompson counted out the $10,000, Porterfield would not take the $10,000 until he had determined that Thompson was "straight," i.e., not wired.

Rather than arrest Porterfield on the spot, however, the sheriff's deputies took the additional procedural step of seeking an arrest warrant for Porterfield from a magistrate based on the information that they had. Porterfield was thus arrested not upon what the sheriff's deputies believed, but upon the warrant that the magistrate issued. The Supreme Court has held that when a police officer acts pursuant

10

to a warrant, he is entitled to qualified immunity if he could have reasonably believed that there was probable cause to support the application. See Malley, 475 U.S. at 344-45 ("Only where the warrant application is so lacking indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost" (citation omitted)). Since there were sufficient indicia of probable cause to arrest Porterfield, as we have indicated already, it follows that there were sufficient indicia of probable cause to seek a warrant.

Porterfield maintains that the warrant was invalid because it rested upon falsehoods, particularly the sheriff's deputies' interpretation of the statement "cold, leave the blow out," which, he contends, clearly manifested his desire not to deal in drugs with Thompson. As we have already noted, however, when this statement is viewed in light of the surrounding circumstances of this case -- for example, Porterfield's decision to proceed with the transaction, his willingness to manipulate the title papers to avoid forfeiture, and his search of Thompson for a wire -- this statement was not sufficient to convey to the sheriff's deputies that Porterfield did not intend to sell the car in exchange for drugs, as maintained by Thompson. And even if the statement clearly communicated Porterfield's desire not to deal cocaine, it did nothing to dispel the sheriff's deputies' belief that Porterfield believed he was accepting and thereby laundering what he believed to be drug money. Although the money laundering conviction was later reversed on appeal as a technical matter of statutory construction, qualified immunity jurisprudence, as well as common sense, forbids us from charging the sheriff's deputies with the foresight to anticipate that even though the prosecutor, the judge, and the jury would all agree with them that Porterfield had attempted to launder money, the South Carolina Court of Appeals would reverse this decision as a matter of law in a case of first impression.

We should also note that in this case there are additional external indicators that Porterfield was in fact engaged in illegal activity, indicators that became known to the prosecutor, the grand jury, the judge, and the jury. In addition to the facts that the sheriff's deputies had before them at the time they applied for the arrest warrant, the consignment agreement for the Mercedes Benz, recovered in the search of the dealership incident to Porterfield's arrest, revealed that if Porterfield had sold the car for only $10,000, the dealership would

11

have realized a $2,300 loss, but that if he had not sold the car at all, the dealership would have realized a $300 gain. In other words, there was no economic reason for Porterfield to have sold the automobile for only the $10,000 in cash. And in light of this extrinsic evidence, it is further unlikely that Porterfield's statement,"cold, leave the blow out," can reasonably be interpreted as anything but an instruction to leave the cocaine worth over $4,000 in the dealership's rental car for later collection.

In short, the sheriff's deputies did not violate any of Porterfield's rights against malicious prosecution of which a reasonable person would have known, and they were, therefore, entitled to qualified immunity on the malicious prosecution claims.

V

Finally, the sheriff's deputies contend that the district court erred in rejecting their assertion of qualified immunity from Porterfield's claim for an illegal search.

In his second amended complaint, Porterfield seems to allege that the search incident to his arrest was performed illegally and without probable cause and that the sheriff's deputies did not act in good faith in executing his arrest, all of which violated his Fourth Amendment rights. It is well settled, however, that searches incident to a lawful arrest do not violate the Fourth Amendment. See, e.g., United States v. Nelson, 102 F.3d 1344, 1346 (4th Cir. 1996). Because the search of Porterfield was effected pursuant to a valid warrant supported by probable cause, the search did not run afoul of Porterfield's Fourth Amendment right to be free from unreasonable searches.

In sum, because the sheriff's deputies in this case were entitled to qualified immunity on each of Porterfield's claims against them in their individual capacities, the district court's order rejecting qualified immunity is reversed. We remand this case to the district court with instructions to dismiss it on the basis of qualified immunity.

REVERSED AND REMANDED

12