Rochester **TRUELOVE** and Samantha Truelove, Plaintiffs,

v.

Martha **HUNT**, individually as an officer of the Georgetown County Sheriff's Department; Terry Sussinni, individually as an officer of Georgetown County Sheriff's Department; Kathleen Ward, individually as an officer of the Georgetown County Sheriff's Department; Wayne Owens, individually as an officer of the Georgetown County Sheriff's Department; and Jonathan Giles, individually as an officer of the Georgetown County Sheriff's Department, Defendants.

No. 2:98–159–11.

United States District Court,
D. South Carolina,
Charleston Division.

Sept. 29, 1999.

---

Michael Montgomery Shetterly, Finkel and Altman LLC, Columbia, SC, for Rochester Truelove, plaintiff.

John Dennis Delgado, Columbia, SC, Adrian L. Falgione, Lexington, SC, for Samatha Truelove.

William Walter Doar, Jr., McNair Law Firm, PA, Georgetown, SC.

Thomas J. Rubillo, Georgetown, SC, for Martha J. Hunt, defendant.

## ORDER

NORTON, District Judge.

This matter is before the court on Defendants' Motion for Summary Judgment filed March 3, 1999.

## I. FACTUAL BACKGROUND

Because this action is before the court on Defendants' Motion for Summary Judgment, the facts are stated in the light most favorable to the Plaintiffs:

1. Plaintiff Samantha Truelove, formerly known as Samantha Anne Mullins, lived in North Carolina. She had a relationship with Richard Walton, which produced a child, born on February 9, 1995. The relationship ended in March 1995, and Mr. Walton and Mrs. Truelove became involved in a custody dispute in North Carolina over the baby, Elizabeth.

2. In July 1995, the North Carolina Family Court awarded custody to Samantha Mullins, the mother, provided she remained in her parents' home. Mr. Walton, the father, had the right to visitation every weekend.

3. Some time in the fall of 1995 Samantha moved to South Carolina and thereafter married Plaintiff Rocky Truelove.

4. In September 1995, Mr. Walton obtained a change of custody order from the North Carolina court.

5. In November 1995, Mr. Walton tracked Plaintiffs to Georgetown, South Carolina and, at a gas station, tried to take the baby. An altercation occurred between Mr. Walton and Mr. Truelove. Two Georgetown County Sheriff's officers intervened and Mr. Walton was arrested. The Sheriff's deputies responding to the scene advised Mr. Walton that a North Carolina custody order had no effect or authority in South Carolina. Mr. Walton spent the night in jail, and the next day swore out a warrant for the arrest of Mr. Truelove.

6. Mr. Truelove was arrested on a charge of aggravated assault and battery and spent a week in jail. He was cleared of the charges and released.

7. Mr. Walton continued to "stalk" Plaintiffs until January 1996. Other incidents regarding the custody dispute occurred, and the Georgetown County Sheriff's Department was made aware of these incidents.

8. In early January 1996, Mr. Walton and two Georgetown County deputies appeared at Plaintiffs' house with a North Carolina change of custody order. Ultimately, the two deputies refused to remove the child after a Georgetown County Family Court Judge told them that the North Carolina order was not enforceable in South Carolina.

9. On Sunday evening January 21, 1996, Defendants Sussinni, Ward, Giles and Owens of the Georgetown County Sheriff's Department entered Plaintiffs' apartment.

10. Defendants possessed a "patently false and forged" South Carolina court "order" that they had received directly from Mr. Walton. Based solely upon this "order," they demanded that Samantha Truelove turn over her baby into their custody.

11. Plaintiffs urged the Defendants present in their home to review the obvious flaws in the "order" and to consider the recent harassment of them by Mr. Walton concerning the custody of baby Elizabeth.

12. Plaintiffs again pointed out to the Defendants that the papers constituting the alleged South Carolina custody "order" were obvious forgeries, were signed in Mr. Walton's handwriting, and claimed to have been filed in the "Court of General Justice." There is no such entity as the "Court of General Justice" in South Carolina.

13. Defendant Ward called her supervisor, Defendant Hunt, for her suggestions on the situation. Upon hearing that there was an "order" authorizing the removal of the baby and notwithstanding Plaintiffs' contentions that the "order" was obviously forged, Defendant Hunt ordered that the baby be immediately removed from Plaintiffs.

14. The Defendants forced Plaintiff Samantha Truelove to nurse and dress her

child; they also threatened to arrest her if she did not "calm down."

15. Defendants refused Plaintiffs' request for a copy of the custody "order" pursuant to which they were removing the child.

16. Defendants took the baby from Plaintiffs and turned her over to Mr. Walton.

17. The removal of the child in this case was very unusual. The usual procedure involved the South Carolina Department of Social Services ("DSS"), and a DSS employee typically accompanies deputies to remove a child. No DSS employee was involved in this removal.

18. The next day, Monday January 22, 1996, Plaintiffs went to the Georgetown County Family Court and found that the custody order was indeed a forgery.

19. Upon reporting the forgery to the police, an arrest warrant was obtained the following day charging Mr. Walton with forging the "order".

20. By this time, Mr. Walton had removed the baby to North Carolina.

21. In their Amended Complaint, Plaintiffs make the following claims against Defendants: Illegal Seizure of the Person, Unlawful Search and Seizure, Assault, Battery, False Arrest and Imprisonment, Invasion of Privacy (42 U.S.C. § 1983), Invasion of Privacy (state law), and Outrage.

22. Defendants assert the following defenses: that Plaintiffs have failed to allege facts upon which relief can be granted, that the action is barred by the South Carolina Tort Claims Act, that Defendants acted in good faith and are entitled to qualified immunity, that the action is barred by a two year statute of limitations, and finally, that Defendants owed no individual duty to Plaintiffs, but rather to the public at large. As it was the only issue argued at summary judgment, this order addresses only the defense of qualified immunity.

## II. SUMMARY JUDGMENT STANDARD

A party moving for summary judgment is entitled to judgment when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of showing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When determining whether there is an issue for trial, the court must view the inferences to be drawn from the underlying facts in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Additionally, Defendants' motion in this case is based upon their claim of qualified immunity, and qualified immunity should be resolved at the summary judgment stage, if possible. *See DiMeglio v. Haines,* 45 F.3d 790, 794 (4th Cir.1995) ("[The qualified immunity inquiry] is a pure question of law . . . and hence always capable of decision at the summary judgment stage.") (quotations and citations omitted).

## III. ANALYSIS

Defendants move for summary judgment based on the defense of qualified immunity. A plaintiff may seek redress for the violation of her constitutional rights by a state actor who was acting under the color of state law. *See* 42 U.S.C. § 1983 (Supp.1998). However, a law enforcement officer is qualifiedly immune from civil damages suits so long as his "conduct does not violate clearly established rights of which [a] reasonable person would have known." *Porterfield v. Lott,* 156 F.3d 563, 567 (4th Cir.1998) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The United

States Court of Appeals for the Fourth Circuit has stated:

It [qualified immunity] protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright-lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992). Thus, although the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir.1992) (explaining that "[t]he fact that an exact right allegedly violated has not earlier been specifically recognized by any court does not prevent a determination that it was nevertheless 'clearly established' for qualified immunity purposes" and that " '[c]learly established' in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked"). As we recently reiterated, the law is clearly established such that an officer's conduct transgresses a bright line when the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state in which the action arose. *See Jean v. Collins*, 155 F.3d 701, 709 (4th Cir.1998) (en banc).

*Norwood v. Bain*, 166 F.3d 243, 252 (4th Cir.1999).

■ To determine whether an officer's conduct is covered by qualified immunity, the Fourth Circuit advocates a three step process: (1) Identify the specific right that the plaintiff asserts was infringed by the challenged conduct. In other words, first determine "whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Wilson v. Layne*, 526 U.S. 603, ——, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999); *see Taylor v. Waters*, 81 F.3d 429, 433 (4th Cir.1996). (2) Decide whether that right was clearly established at the time of the alleged violation, and, if so, (3) determine whether a reasonable person in the officer's position would have known that his or her actions violated that right. *See Gould v. Davis*, 165 F.3d 265, 269–73 (4th Cir.1998); *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir.1992).[1]

■ The Fourth Circuit has recently clarified the analysis that a court must perform within the familiar three-prong framework qualified immunity cases. *See Gould v. Davis*, 165 F.3d 265, 269–73 (4th Cir.1998). According to *Gould*, courts and parties have misconstrued the third prong of the three-part qualified immunity test. *See id.* at 273. In the final prong, a court "must determine whether a reasonable person in the officer's position would have known that his actions violated the right alleged by the plaintiff." *Id.* at 272. The court found that the parties erred by arguing about "whether the officers acted 'reasonably' in the sense in which that term is used in tort law." *Id.* at 273. Instead, the *Gould* court explained that the concept of objective reasonableness in the context of qualified immunity meant simply that the inquiry was objective, rather than subjective. *See id.* The Fourth Circuit indicated that the confusion was "understandable" because the parties in *Gould* and some courts "define the right alleged by a § 1983 plaintiff at a very general level under the second prong and consider the factual circumstances under the third prong." *Id.* Once the right is defined broadly, "the second prong of the qualified immunity analysis becomes a pro forma

---

1. The United States Supreme Court has explained the importance of the sequential analysis thus: "Deciding the constitutional before addressing the qualified immunity question promotes clarity in the legal standards for official conduct, to the benefit of both officers and the general public." *Wilson v. Layne*, 526 U.S. 603, ——, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999).

recitation of a general constitutional right, and the real 'work' (that is, the consideration of the specific facts of the case) is done under the third prong." *Gould,* 165 F.3d at 273. Instead, the *Gould* court instructed that "the right in the second prong [should be] well-defined [in a] fact-specific manner [so that] the third prong will be quite easy to resolve, absent extraordinary circumstances."[2] *Id.* The question in the final prong becomes "whether a reasonable person would have known about controlling law, once that law is deemed to have been clearly established under the second prong." *Id.* When the inquiry proceeds to the third prong, then, absent extraordinary circumstances that prove the officer neither knew nor should have known of the relevant legal standard, the qualified immunity defense should fail. *See id.* Under this conception of the third prong of the qualified immunity analysis, the objective reasonableness inquiry "is not a freestanding evaluation of the 'reasonableness' of an officer's actions." *Id.*

Additionally, the United States Supreme Court has also clarified the first prong of the inquiry by requiring a "court evaluating a claim of qualified immunity [to] . . . first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Wilson v. Layne,* 526 U.S. 603, ——, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999). The *Wilson* Court carefully considered the particular fact pattern of the case in light of constitutional law and went on to determine that the defendants' actions were in violation of the Fourth Amendment. After this finding, the Court addressed the qualified immunity question of whether the right violated was clearly established at the time of the incident.

Based on the analysis in *Gould* and *Wilson,* this court will address the issue of qualified immunity within the framework of the traditional three-pronged inquiry, performing most of its "work" in the second prong. Under the first prong of the qualified immunity analysis. Plaintiffs have identified the rights they claim were violated as their Fourth, Fifth, and Fourteenth Amendment rights. Specifically, Plaintiffs point to their Fourth Amendment right to avoid unreasonable searches of their home, their Fourth Amendment "fundamental right of privacy" in their home, and their Fourth Amendment right to freedom from being arrested or unlawfully restrained. Plaintiffs also assert that their substantive due process right to privacy, essentially, their liberty interest in family integrity or familial privacy, was also violated. Defendants argue that the constitutional right that Plaintiffs claim was violated is some amorphous right to be served only genuine orders.

### A. Plaintiffs' Fourth Amendment Claims

■ Individuals have a general Fourth Amendment right to privacy. They have a general right to be free from intrusion by government officials into their homes. *See Buonocore v. Harris,* 65 F.3d 347 (4th Cir.1995) (discussing the Fourth Amendment, the common law leading up to its ratification, and warrants). As stated by the United States Supreme Court, "[p]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court for E.D. Michigan,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

■ Although a law enforcement officer is typically entitled to qualified immu-

---

**2.** This court must make a fact-specific determination as the applicability of qualified immunity does not turn on an "alleged violation of extremely abstract rights." *Anderson v. Creighton,* 483 U.S. 635, 637–9, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The characterization of the constitutional right can be diffi-

cult. The right cannot be defined at a level so general as to provide no immunity from liability, nor should it be defined so narrowly that governmental officials are always allowed free violation. *See Swanson v. Powers,* 937 F.2d 965 (4th Cir.1991).

nity based upon 'good faith' reasonable actions, there is no question that a warrantless search or arrest is unconstitutional. *See* U.S. Const.Amend. IV (a warrant shall not "issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized"); *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).[3] Further, a search or seizure based upon an invalid warrant is the same as a warrantless search and is also unconstitutional. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Good faith reliance or probable cause often renders the actions of law enforcement officers reasonable, and therefore within the protection of qualified immunity; however, there is a clear distinction in the law between a facially valid warrant and a facially invalid one. *See Leon*, 468 U.S. at 923, 104 S.Ct. 3405 ("[D]epending on the circumstances of the particular case, a warrant may be so facially deficient ... that the officers cannot reasonably presume it to be valid."); *Brooks v. City of Winston–Salem*, 85 F.3d 178 (4th Cir.1996) (a public official cannot be charged with false arrest when he arrests a defendant pursuant to a *facially valid warrant*); *Mitchell v. Aluisi*, 872 F.2d 577 (4th Cir.1989) (arrest made pursuant to a *facially valid warrant* does not give rise to a constitutional claim); *United States v. Toler*, 901 F.2d 399, 401 n. 2 (4th Cir.1990) (court declined to address exclusionary rule "because it is clear that the search was conducted pursuant to a *facially valid warrant*"). It follows, therefore, that a facially invalid warrant is the same, constitutionally, as no warrant at all. Similarly, a facially invalid, forged order is the same as no order at all and by analogy, an officer who acts pursuant to a facially invalid order violates a person's Fourth Amendment rights.

■ It is undisputed that there is no such entity as the "Court of General Justice" in South Carolina. In the light most favorable to Plaintiffs, Defendants took their baby pursuant to a patently faked and forged order. Although a facially valid arrest warrant, search warrant, or court order may have conferred certain limited authority to enter Plaintiffs' home, the order in this case was patently forged so that the officers, using the order as a means of entry into Plaintiffs' home, acted without authority. *See, e.g., Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment."). This court finds that it is in violation of the Fourth Amendment for Sheriff's deputies to enter into a home, detain its occupants, and remove their child based upon a forged, patently false, facially invalid custody order issued by a court that does not exist.

■ Because Defendants actions in this case violated Plaintiffs' Fourth Amendment rights, this court must now decide whether this right was clearly established at the time of the search.

"Clearly established" for purposes of qualified immunity means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.*, at 640, 107 S.Ct. 3034, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (internal citations omitted);

*Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (allowing entry into suspect's home when officer had probable cause and exigent circumstances).

---

**3.** There are exceptions to this rule, although none of those apply here. *See, e.g., Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (plain view doctrine);

see also United States v. Lanier, 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

Wilson v. Layne, 526 U.S. 603, ——, 119 S.Ct. 1692, 1699, 143 L.Ed.2d 818 (1999); see also Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir.1992) ("Clearly established" includes rights that are already 'specifically adjudicated,' and those rights "manifestly included within more general applications of the core constitutional principle invoked.' "). The law is clearly established when the law has been authoritatively decided by the Supreme Court, the Fourth Circuit, or the South Carolina Supreme Court. Norwood v. Bain, 166 F.3d 243 (4th Cir.1999).

As further explained in Wilson, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." Wilson, 526 U.S. at ——, 119 S.Ct. at 1701 (citing Anderson, 483 U.S. at 641, 107 S.Ct. 3034). In this case, the specific right, defined at the appropriate level of factual specificity, is the right to be free from law enforcement officers entering a person's home to search or seize [4] a minor child based upon a patently false, forged, and fictitious court custody order. Although this court can find no case directly on point, i.e. the exact conduct at issue has not been held to be unlawful by the United States Supreme Court, the Fourth Circuit, or the South Carolina Supreme Court, the unlawfulness of the conduct is manifest.[5] There is, as described previously, ample case law regarding warrantless searches and arrests which can be easily analogized to this case. See Horton v. California, 496 U.S. 128, 140, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) ("If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more."); Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (finding that the right of man to retreat into his own home and there be free from unreasonable government intrusion, including seizures of property and seizures of person stands at the very core of the Fourth Amendment); State v. Bailey, 276 S.C. 32, 274 S.E.2d 913, 915 (1981) ("Warrantless searches are per se unreasonable unless an exception to the warrant requirement is presented."). The rub in this case stems from the fact that this court, as acknowledged by the Defendants, must accept for purposes of summary judgment, the factual allegations that the forged order was "patently false and forged." Any law enforcement officer should know that a forged court order purportedly filed in a fictitious court gave him or her no authority to act in accordance with the requirements of the order.

Qualified immunity will serve to protect "all but the plainly incompetent and those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). If this court takes the facts, as it must, in the light most favorable to Plaintiffs, and it accepts that the order was patently faked, false and forged, that Defendants were notified of the forgery, that the order was filed in a court that Defendants knew or should have known did not exist, that the order came to Defendants in an unusual manner, and that Defendants were aware, or should have been aware, of the recent problems between Plaintiffs and Mr. Walton, then "plainly incompetent" is an apt description of Defendants' actions. Plaintiffs' right to be free from this non-emergency, governmental intrusion into their

---

4. Seizure under the Fourth Amendment can occur when physical force is applied or when a person submits to an official show of authority. See California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

5. See Norwood v. Bain., 166 F.3d 243, 252 (4th Cir.1999) ("[A]lthough the exact conduct at issue need not have been held to be unlawful ..., the existing authority must be such that the unlawfulness of the conduct is manifest.").

home based upon a patently fake and forged order was clearly established and, in this case, clearly violated by Defendants.

Because the right was clearly established at the time of the alleged violation, this court must consider whether a reasonable person would have known about the controlling law. As explained by the Fourth Circuit in *Gould,* when the inquiry proceeds to the third prong, then, absent extraordinary circumstances that prove the officer neither knew nor should have known of the relevant legal standard, the qualified immunity defense should fall. *See Gould v. Davis,* 165 F.3d 265, 273 (4th Cir.1998). In this case, Defendants have not offered any extraordinary circumstances that would explain why the deputies did not know and could not have known of the applicable legal standard. As a result, this court will not grant summary judgment based upon the defense of qualified immunity.

### B. Plaintiffs' Due Process Claims

As explained previously, qualified immunity analysis requires the identification of the right allegedly violated. This court must establish first whether or not Plaintiffs have even alleged the deprivation of an actual constitutional right. Accordingly, this court finds that there is a general right to familial privacy, which encompasses an individual's fundamental liberty interest in his or her parental rights. *See, e.g., Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). More specifically, the Fourth Circuit has held that:

> the state's removal of a child from his parents indisputably constitutes an interference with a liberty interest of the parents and thus triggers the procedural protections of the fourteenth amendment. There are few rights more fundamental in and to our society than those

of parents to retain custody over and care for their children and to rear their children as they deem appropriate.... [T]he bonds between parent and child are, in a word, sacrosanct, and the relationship between parent and child inviolable except for the most compelling reasons.

*Jordan v. Jackson,* 15 F.3d 333, 342–43 (4th Cir.1994).

However, the precise contours of the right are not clearly established. *See id.* For example, "the maxim of familial privacy is neither absolute nor unqualified and may be outweighed by a legitimate governmental interest." *Hodge v. Jones,* 31 F.3d 157, 163–64 (4th Cir.1994). In *Hodge,* the parents were cleared of charges of suspected child abuse and brought suit to challenge the constitutionality of the state's maintenance of records of suspected child abuse investigations. Unlike this case, the "[s]tate action affected the parental relationship only incidentally." *Id.* at 163–64. This incidental effect was not sufficient to establish a violation of an identified liberty interest. The lack of evidence that the defendant's actions had any significant impact on the parent-child relationship precluded the establishment of a familial privacy infringement of constitutional magnitude. *Id.*

In this case, Defendants entered the Plaintiffs' home unlawfully, removed a child, and gave that child to another based upon a patently false and forged order. Defendants received the forged order in an unusual manner on a Sunday night from a man with whom the Georgetown County Sheriff's Department had had "previous dealings" in prior months. This was not a situation in which the Department of Social Services suspected a family problem and removed a child after the appropriate due process, nor was it an emergency situation in which a child was removed pursuant to South Carolina law allowing emergency protective custody. *See, e.g.,* S.C.Code Ann. § 20–7–610(A) (Supp.1998);

*Hooper v. Rockwell,* 334 S.C. 281, 513 S.E.2d 358 (1999). In fact, this child was not even transferred to state custody, but rather handed over by Defendants, without any process, to the forger of the order. Defendants in this case had no reason or authority to remove baby Elizabeth, other than a patently forged and false order. As a result, there was no legitimate governmental interest in the removal to be weighed against Plaintiff Samantha Truelove's parental rights. Defendant's actions clearly impinged upon the family relationship, violating, at least, Plaintiff Samantha Truelove's constitutional rights.[6]

■ Based on this analysis, this court finds that it is a violation of the Fourteenth Amendment for law enforcement officials to remove a child from a parent based upon a patently false and forged court order. In light of this finding of a violation, this court must now determine if the right allegedly violated was clearly established at the time of the alleged deprivation. As explained previously, this requires the court to define the right allegedly violated at an appropriate level of specificity. In this case, the specific right, defined at the appropriate level of factual specificity, is a parent's right to be free from law enforcement officers removing her child from her custody based upon a patently false and forged family court custody order and giving that child to the forging parent.

■ This court finds that it was unreasonable for the Sheriff's deputies to have believed that they could remove a child from her mother based upon a patently forged and false order and give that child over to the party that forged the order. As with the claim predicated on the Fourth Amendment, while there are no cases exactly on point, the law is manifestly clear.

In *Jordan v. Jackson,* 15 F.3d 333 (4th Cir.1994), the Fourth Circuit addressed a situation in which a child had been removed from his home pursuant to the Virginia Code. The parents of the child argued that the code sections which had authorized the 'emergency' removal of the child were unconstitutional because they violated the procedural guarantees of the Fourteenth Amendment by permitting a delay of several days before obtaining judicial review of the state's decision to take emergency custody of a child. In determining the constitutionality of the statute, the Fourth Circuit discussed the clear and longstanding right of a parent in not having a child removed from the home without clear and compelling state interests and appropriate due process. *See id.* at 342–43. The Court stated that "[i]t is beyond question ... that the adult Jordans' parental rights implicated by the challenged delay [in process] are commanding and deserving of the greatest solicitude. The forced separation of parent from child, even for a short time represents a serious impingement on those rights." *Id.* The Court further explained that "[w]here the state seeks to interfere with these essential ... or fundamental parental rights, its action must satisfy the procedural strictures of the Due Process Clause." *Id.*

■ The result in *Jordan* was that despite the "substantial private interests" at stake, the delay in judicial review of an emergency removal was found constitutional. Nevertheless, the case made clear that a parent has a substantial interest in her relationship with her child so any removal from her custody, even those made based upon clear and compelling state interests, triggers the right to due process. *Id.* In light of the case law, this court finds that it was "clearly established" at the time Baby Elizabeth was removed from her mother that it is a violation of the

---

**6.** This court notes that Rochester Truelove may have little, if any, constitutional right "to retain custody over and care for ... and to rear" baby Elizabeth, as he was not her father nor had he adopted her. The court does not have enough facts to determine what rights he may or may not have regarding this issue.

Fourteenth Amendment for law enforcement officials to remove a child from a parent based upon a patently false and forged court order.

Finally, there are no extraordinary circumstances explaining why Defendants did not know and should not have known of the controlling law. Therefore, as with Plaintiffs' Fourth Amendment claims, this court finds, for the same reasons, that Defendants are not entitled to summary judgment based upon the defense of qualified immunity.

Based on the foregoing, it is

**ORDERED,** that Defendants' Motion for Summary Judgment is **DENIED.**

**AND IT IS SO ORDERED.**