**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 17-1064**

_____

DAVID ROYAL LEE,

          Plaintiff – Appellant,

v.

FORT MILL, TOWN OF; POLICE OFFICER ROBERT GIGLIO, officially and individual; POLICE OFFICER ROYCE CLACK, officially and individually,

          Defendants – Appellees.

_____

Appeal from the United States District Court for the District of South Carolina, at Rock Hill.  Joseph F. Anderson, Jr., Senior District Judge.  (0:15-cv-03546-JFA)

_____

Argued:  December 5, 2017                   Decided:  March 1, 2018

_____

Before GREGORY, Chief Judge, MOTZ, and TRAXLER, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** James Elliot Field, Charlotte, North Carolina, for Appellant.  Andrew Lindemann, DAVIDSON & LINDEMANN, P.A., Columbia, South Carolina, for Appellees.  **ON BRIEF:** David A. DeMasters, DAVIDSON & LINDEMANN, P.A., Columbia, South Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

David Royal Lee appeals a district court order granting summary judgment against him on his action asserting claims relating to a police officer's shooting of his dog and his arrest thereafter for reckless driving. Finding no error, we affirm.

I.

Viewing the record in the light most favorable to Lee, we glean the following facts from the summary judgment record. In the early evening of July 1, 2013, Lee made a non-emergency call to the Fort Mill, South Carolina, Police Department concerning alleged harassment by his neighbor against Lee's girlfriend. Officer James Lyons was dispatched to Lee's house to take his complaint, and Officer Robert Giglio rode with him. On their way over, the officers received a call from another officer warning them to turn on their dashboard camera and microphones based on problems that other officers had encountered at Lee's home. Because Officer Lyons had trouble locating Lee's residence, he ended up driving just past Lee's house and parking on the street in front of Lee's next-door neighbor's house, just a few feet past Lee's driveway.

Seconds before, when the officers had passed Lee's house, Officer Giglio had observed a woman who was later identified as Lee's girlfriend, as well as two large-breed dogs in Lee's front yard that appeared to him to be pit bull mixes. Upon seeing the dogs in Lee's yard, one of the officers had remarked, "[T]hey need to put their pit bulls away." Dkt. 22-3 at 1:24-1:26. Around that same time, Lee had stepped inside his residence, momentarily leaving his girlfriend outside on the front porch with the dogs.

2

Officer Lyons exited the driver's side of the patrol car – facing the street – and closed his door. Officer Giglio spent a few seconds finishing a text message. Then he exited the passenger's side of the patrol car, facing Lee's next-door neighbor's house. As soon as he closed the car door, Officer Giglio heard barking and turned around to look behind him.[1] As he turned, he saw Lee's two dogs—which weighed 70 and 80 pounds, respectively. They were running toward him "aggressively" and "at full speed," with one ahead of the other by about ten feet.[2] J.A. 100. His back to the patrol car, Officer Giglio felt trapped and feared for his life. He drew his service pistol and, with the lead dog about 20 feet away, fired three shots in succession. The first, aimed at the lead dog, missed but caused that dog to stop running. The second, aimed at the dog that was still charging, also missed but did not stop the dog. However, the third shot hit the charging dog, later identified as "T," in the face. The time elapsed from the first bark to the third and fatal shot was approximately one second.

---

[1] Lee maintains that the record creates a genuine factual dispute regarding whether Officer Giglio closed his door. However, from the audio portion of the recordings from the patrol car, one can plainly hear Officer Giglio close his door after he exited the vehicle. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). As we will explain, however, whether there was a factual dispute regarding whether the door was open is not material to our decision.

[2] A witness affidavit stated that the dogs were "mouthing at one another as they approached." J.A. 391. He did not elaborate on what he meant by that phrase, however, and he did nothing to contradict Giglio's account that the dogs were running at him "aggressively."

Having walked inside his home as he saw the officers driving up, Lee never saw the officers exit their vehicles, and he was still inside when the shooting occurred. When he emerged from his home and realized that T had been shot, he became irate, screaming and yelling expletives at the officers and pacing around the front yard. The officers informed Lee of how the shooting had occurred and told him to get his dogs inside his home.

Officer Rob Marshall then arrived at the scene in his patrol car. Lee approached his car and confronted him regarding the shooting. Soon thereafter, Defendant Officer Royce Clack also arrived.

Lee then went back inside his home and retrieved T, who, although wounded, had been able to walk back inside. Hoping to hurry T to the animal hospital, Lee placed the dog in the back of his Jeep and backed out of his driveway. His tires squealed slightly when, driving forward, he turned to the right to begin heading down the road. And when he saw that two police cars were in the roadway, he briefly veered onto the grass in the front of his neighbor's home in order to get around the cars. At that point Officer Marshall ordered Officer Clack to catch up with Lee and stop him to prevent him from "endangering other people over a dog." Dkt. 22-4 at 3:22-3:24.

Officer Clack returned to his patrol car, activated his blue light, and caught up to Lee in less than a minute. Once Lee was in his view ahead of him, Officer Clack observed Lee perform an illegal U-turn in front of another car on a two-lane road that was divided by solid double yellow lines. Officer Clack believed Lee's U-turn created the potential for a collision.

4

Having made the U-turn, Lee then drove past Officer Clack, who turned his patrol car around to continue to pursue Lee. With his siren activated, Officer Clack ordered Lee twice through his loudspeaker to pull over. Nevertheless, Lee continued driving for about 40 seconds.

When he finally stopped, Lee jumped out of his Jeep. Pointing into his vehicle, he yelled at Officer Clack that his dog had been shot. Officer Clack responded by ordering Lee to put his hands on the Jeep, and he handcuffed him, placed him in the back of his patrol car, and told him he was being detained. Lee proceeded to wail and curse and kick at the patrol-car window off and on for about 25 minutes, screaming that his dog needed help and was going to die without it. Officer Clack told Lee that animal control was on the way, and he eventually told Lee he was under arrest for reckless driving. He transported Lee to jail, leaving another officer to stay with T and the Jeep.[3] York County Animal Control and Lee's mother later arrived to lend assistance with T. Although they transported the dog to an emergency animal clinic, by the time he reached the clinic, he had suffered extensive blood loss, and Lee's mother authorized the clinic to euthanize him.

Lee subsequently filed suit in state court against the Town of Fort Mill and Officers Giglio and Clack, alleging federal § 1983 claims for unreasonable seizure of his

---

[3] Lee was charged with violating the York County dog-at-large ordinance, damaging Fort Mill property, and engaging in public disorderly conduct. He later pled guilty to violating the dog ordinance and damaging Fort Mill property and the disorderly conduct charge was dismissed.

5

dog and false arrest and imprisonment, as well as state claims of intentional infliction of emotional distress and gross negligence.

The defendants removed the action and then moved for summary judgment on all claims. Lee opposed the motion.

The case was referred to a federal magistrate judge, who recommended granting the motion as to the federal claims and remanding the state claims to state court. After considering Lee's objections, the district court overruled Lee's objections and adopted the magistrate judge's report and recommendation.

II.

Lee first argues that the district court erred in granting summary judgment on his claim that his dog was unreasonably seized. We disagree.

"We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *T–Mobile Ne. LLC v. City Council of Newport News*, 674 F.3d 380, 384-85 (4th Cir. 2012) (internal quotation marks omitted).

A claim that a law enforcement officer improperly used force to seize a plaintiff's effects – including a dog – is analyzed under the reasonableness standard of the Fourth Amendment. *See Altman v. City of High Point, N.C.*, 330 F.3d 194, 205 (4th Cir. 2003). "Under the basic reasonableness calculus, a court must balance the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interests alleged to justify the intrusion." *Id.* (internal quotation marks

6

omitted).  In the case of a household pet, "the use of deadly force . . . is reasonable only if the pet poses an immediate danger and the use of force is unavoidable."  *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008).  Importantly, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Altman*, 330 F.3d at 205 (internal quotation marks omitted); *cf. Anderson v. Russell*, 247 F.3d 125, 132 (4th Cir. 2001) ("Officers need not be absolutely sure of the nature of the threat or the suspect's intent to cause them harm" before using force.  (alteration and internal quotation marks omitted)).  "In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed."  *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).[4]

In that moment, Officer Giglio faced two large dogs running aggressively at him at full speed, and he had no indication that they were under anyone's control.  Officer Giglio certainly had reason to believe the dogs posed a serious and immediate threat to

---

[4]     Lee argues that Giglio's first error was in not paying attention to the situation or properly preparing himself to encounter the dogs after noting their presence in the front yard moments before.  But there was nothing in what Giglio observed that would have alerted him to the danger that ensued.  And, as noted, the focus of our inquiry is on the moment that the force was employed. *See Drewitt v. Pratt*, 999 F.2d 774, 779-80 (4th Cir. 1993).

7

him.[5] And he testified that shooting at the dogs "was the only use of force that [he] could have used at the time to reasonably stop them." J.A. 110.

Lee argues that, instead of shooting at the dogs, Officer Giglio could have quickly gotten back into his car and closed the door. But, with the dogs charging at full speed, and only 20 feet away, a reasonable officer could certainly conclude that he did not have time to grab his door handle, open the door, get in to the vehicle, and close the door behind before the dogs jumped on him.[6]

Lee argues that Officer Giglio had other viable options, such as climbing on top of his car or using his Taser. Giglio cogently explained in his testimony the objective circumstances that precluded those alternatives.[7] The more important consideration, though, beyond Giglio's explanations for why these particular alternatives were not viable, is the "critical reality" that Giglio did not even have a chance to pause and

---

[5] Lee argues that the dogs in fact were kind and gentle and would not actually have harmed Officer Giglio, but what the dogs actually would have done is beside the point. Rather, our inquiry focuses on Officer Giglio's reasonable perception of the threat the dogs posed based on the information he possessed.

[6] Given the very short time that Officer Giglio had before the dogs covered the short distance between them, our decision would be the same even if we assumed that the car door was already open when he realized that he had to take action to protect himself.

[7] Officer Giglio testified that had he jumped onto his car, the dogs could have jumped right up with him. And, the only weapons Officer Giglio was carrying were his gun and a Taser. He testified that attempts at using his Taser would have been "[c]ompletely ineffective against two animals." J.A. 114. Lee also argues that Officer Giglio could have motioned or shouted at the dogs or fired a warning shot. Of course, Officer Giglio fired the fatal third shot only after firing two earlier shots that had not stopped T from charging.

consider his options. *Waterman v. Batton*, 393 F.3d 471, 478 (4th Cir. 2005) (concluding that when officers had only about a second before an oncoming car could reach them, they "did not have even a moment to pause and ponder" the many factors that would affect how much of a threat the vehicle posed to them because if they "paused for even an instant, they risked losing their last chance to defend themselves"). Rather, having become aware of the hard-charging dogs, he simply had to take action. Giglio's split-second decision of exactly how to respond to the suddenly discovered threat of serious physical harm is not one that we second-guess in a Fourth Amendment analysis.[8] *See Altman*, 330 F.3d at 205. Accordingly, we conclude that no genuine factual dispute exists regarding whether the seizure of T was reasonable, and Defendants were therefore entitled to summary judgment.

III.

Lee also argues that the district court erred in granting summary judgment against him on his Fourth Amendment false arrest and false imprisonment claims. We disagree.

Lee primarily argues that Officer Clack lacked probable cause to arrest him for reckless driving. "Probable cause to justify an arrest arises when facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has

---

[8] We emphasize that the question of whether Officer Giglio could have made a better decision in the limited time that he had is not before us. *See Altman v. City of High Point, N.C.*, 330 F.3d 194, 207 (4th Cir. 2003) (recognizing that holding that killing of dog was not unreasonable seizure does not mean that the officer's response was the best one possible). Rather, we decide only the question of whether Officer Giglio's response exceeded the boundaries of the Fourth Amendment.

9

committed, is committing, or is about to commit an offense." *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998) (alteration and internal quotation marks omitted). It requires more than bare suspicion, but less than evidence necessary to convict. *See id.*

In South Carolina, a person is guilty of "reckless driving" when he "drives any vehicle in such a manner to indicate either a wilful or wanton disregard for the safety of persons or property." S.C. Code § 56-5-2920. "Violation of a statute does not constitute recklessness, willfulness, and wantonness *per se*, but is some evidence that the defendant acted recklessly, willfully, and wantonly." *Wise v. Broadway*, 433 S.E.2d 857, 859 (S.C. 1993). Regardless of whether Clack had probable cause to arrest Lee based on the way Lee drove in his own driveway and on his own street, Lee's illegal U-turn over the double yellow line in front of another car gave Officer Clack probable cause to believe Lee was driving recklessly.

Lee argues that even if this U-turn violated generally applicable traffic laws, Officer Clack lacked probable cause to arrest him for reckless driving in light of the doctrine of necessity. Lee waived this argument by not presenting it in the district court. *See United States v. Schronce*, 727 F.2d 91, 93-94 (4th Cir. 1984). In any event, though, it fails on its merits.

An officer's knowledge that an apparent offender *may* have a defense against a charge does not necessarily negate probable cause. *See Jocks v. Tavernier*, 316 F.3d 128, 135-36 (2d Cir. 2003) ("We did not impose a duty on the arresting officer to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of

10

unverified claims of justification before making an arrest."). And here, Lee's entitlement to that defense was far from clear.

Under the doctrine of necessity, compliance with generally applicable traffic laws may be excused if:

> (1) there is a present and imminent emergency arising without fault on the part of the actor concerned;
>
> (2) the emergency is of such a nature as to induce a well-grounded apprehension of death or serious bodily harm if the act is not done; and
>
> (3) there is no other reasonable alternative, other than committing the crime, to avoid the threat of harm.

*State v. Cole*, 403 S.E.2d 117, 119 (S.C. 1991). Lee points to nothing that would allow danger of harm to a family pet, as opposed to a human being, to constitute an "emergency." And, even assuming that risk to a pet could constitute an emergency, Lee does not identify any reason that Officer Clack would have known when he stopped Lee that Lee had no "reasonable alternative" to making the illegal U-turn.[9] For these reasons, Defendants were entitled to summary judgment to the extent Lee challenged Clack's decision to arrest him.

Lee also challenges the length and character of his detention. He made a similar argument in his response opposing summary judgment in the district court. However, the magistrate judge, citing *Street v. Surdyka*, 492 F.2d 368, 372-73 (4th Cir. 1974),

---

[9] As for the reason for the illegal U-turn, Lee testified he was driving toward his veterinarian but suddenly realized that it was after hours, and he thought there might be an emergency care animal clinic in a neighboring town that would be open. However, Officer Clack had no reason to know when he stopped Lee why he was making the U-turn or what alternatives he might have had.

concluded that "there is no § 1983 claim for false arrest, false imprisonment or malicious prosecution unless the officer lacked probable cause." J.A. 415. Lee did not challenge this conclusion in his objections to the magistrate's report and recommendation; rather his objections all pertained only to the conclusion that there was no probable cause to stop. As such, arguments regarding the length or character of his detention have been waived. *See Schronce*, 727 F.2d at 93-94. Furthermore, even now, Lee offers no legal support for his conclusory allegation that summary judgment was improper even if Clack had probable cause to stop him for reckless driving. Thus, Lee's argument is waived for that reason as well. *See Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 376 (4th Cir. 2013). And the magistrate judge correctly stated the applicable law in any event.

## IV.

We recognize that this is a truly sad case for Lee. The record before us clearly shows that he loved his dog dearly and that losing him was very painful. Our decision today does not deny that reality, but merely reflects that the officers here were presented with challenging circumstances, and their responses, even if not ideal, fell within the boundaries of the Constitution. For that reason, we affirm the district court's decision affirming summary judgment to Defendants on Lee's constitutional claims and remanding his state claims to state court.

*AFFIRMED*